# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BV ADVISORY PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2022-0719-SG |
| | ) | |
| QUANTUM COMPUTING INC., | ) | |
| QPHOTON, LLC, YUPING HUANG, | ) | |
| XIAO PAN, ROBERT LISCOUSKI, | ) | |
| WILLIAM McGANN, CHRIS | ) | |
| ROBERTS, JOSEPH MICHAEL | ) | |
| SALVANI, GREGORY OSBORN, and | ) | |
| DAN WALSH, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Date Submitted:  January 12, 2024
Date Decided:  May 28, 2024

Thaddeus J. Weaver, DILWORTH PAXSON LLP, Wilmington, Delaware; Thomas S. Biemer and Patrick M. Northen, DILWORTH PAXSON LLP, Philadelphia, Pennsylvania, *Attorneys for Plaintiff*.

Robert L. Burns and Kyle H. Lachmund, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendants Quantum Computing, Inc., QPhoton, LLC, Robert Liscouski, William McGann, Chris Roberts, Joseph Michael Salvani, Greogary Osborn, and Dan Walsh*.

Thomas A. Uebler, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; OF COUNSEL: Steven M. Hecht, ROLNICK KRAMER SADIGHI LLP, New York, New York, *Attorneys for Defendants Yuping Huang and Xiao Pan*.

**GLASSCOCK, Vice Chancellor**

Stevens Institute of Technology is a research university in Hoboken, New Jersey. Defendant Yuping Huang is a professor at the university. In 2020, Huang founded (and solely owned) QPhoton, now a Delaware entity.[1] QPhoton was intended to develop quantum computing.

Shortly thereafter, Plaintiff, BV Advisory LLC, became interested in investing in QPhoton. It "brokered" a lease of IP from the university to QPhoton, then, in March 2021, purchased 10% of QPhoton's equity pursuant to a stock purchase agreement (the "SPA"). Relatedly, Plaintiff, Huang, and QPhoton entered a voting agreement (the "Voting Agreement"), which required Huang to create a three-person board of directors and appoint Plaintiff's designee, Michael Kotlarz, to the board.

At about the same time, Plaintiff and QPhoton entered a Note Purchase Agreement (the "NPA"), under which Plaintiff purchased $500,000 worth of notes convertible to equity in QPhoton. The central—but by no means only—issue in this litigation is the effect on those convertible notes of a merger of QPhoton with Defendant Quantum Computing, Inc. in 2022.

In October of 2021, two entities allied with Plaintiff's principals signed a letter of intent (the "October LOI") with QPhoton, which contemplated investment in QPhoton in exchange for convertible preferred stock; investment that, if

---

[1] *See* n.21, *infra.*

1

consummated, would represent "investor financing" that would cause conversion of Plaintiff's QPhoton notes to equity. This would result in Plaintiff holding 45% of QPhoton's equity. Subsequently, certain of the lenders' rights under the October LOI were transferred to Plaintiff.

This litigation, broadly, arises out of the May 2022 acquisition of QPhoton by Defendant Quantum Computing Inc., and its aftermath, allegedly in derogation of rights held by Plaintiff under the contracts just discussed, as well as fiduciary duties. The merger, originally negotiated on QPhoton's behalf by Plaintiff's principal, Keith Barksdale, contemplated a stock-for-stock merger which would leave QPhoton equity holders in the minority. The term sheet created at this negotiation phase also anticipated a role (and salary) for Huang in the merged entity. During the pendency of the negotiations, however, Plaintiff (or Barksdale) objected to certain actions of the buyer, including Quantum's taking on $8 million in debt. Huang took over the negotiations, bargained for a salaried role for himself in the post-merger entity, and a merger agreement was reached at the same exchange ratio as contemplated before Quantum's assumption of debt. The acquirer's stock was volatile, and the exchange ratio implied a lower value for Quantum than that implied at the time of the term sheet.[2] Plaintiff's principal, Barksdale, threatened suit over the merger, and a special

---

[2] According to the Complaint, Barksdale and his Quantum counterparties agreed to a different exchange ratio at some undisclosed point in time, but the term sheet was not amended in writing. *See* Verified Second Am. Compl. ¶ 95, Dkt. No. 61 ("SAC").

committee was formed to address potential litigation.[3] The Special Committee excluded Plaintiff's designee, Kotlarz, which Plaintiff alleges violated the Voting Agreement.

The merger closed, and the successor entity attempted to redeem Plaintiff's convertible notes, at face value, plus interest. Plaintiff brought an appraisal action, and also filed this suit. This action alleges breach of the Voting Agreement, the NPA, the BV Notes and the October LOI (and associated tortious interference claims), breach of fiduciary duty (and associated aiding-and-abetting claims), and fraudulent transfer and unjust enrichment. Defendants include Quantum and QPhoton, and also Huang and other fiduciaries of Quantum and QPhoton. The Complaint makes vehement and frequent, but non-specific and conclusory, assertions that individuals associated with the buyer and seller conspired to deprive Plaintiff of value. All Defendants have moved to dismiss under Rule 12(b)(6); certain individual defendants associated with the buyer (the "Individual Defendants") contest personal jurisdiction, as well. The motions to dismiss are partial; no party has moved to dismiss the core contract claim, that certain Defendants have breached the NPA.

---

[3] According to the Complaint, the Special Committee was formed to negotiate the merger. SAC ¶¶ 113, 165, 191. Since the Special Committee was created after the merger agreement was entered, the directionality of time would seem to preclude this, I note.

Below, I attempt in more detail to set out the facts as alleged in the complaint; following that contractual and equitable Brunswick stew of allegations is my analysis, in which I determine that the Individual Defendants must be dismissed under Rule 12(b)(2), and that the Motions under Rule 12(b)(6) compel mixed results.

## I. BACKGROUND

*A. Factual Background[4]*

### 1. The Parties

Plaintiff, BV Advisory Partners, LLC ("BV Advisory" or "Plaintiff") is a New Jersey limited liability company, with its principal place of business in Hoboken, New Jersey.[5]

Non-party Keith Barksdale is the founder and Chief Executive Officer of BV Advisory.[6]

Non-party Michael Kotlarz served as BV Advisory's board designee on QPhoton, Inc.'s board of directors.[7]

Non-party Stevens Institute of Technology ("Stevens") employs Defendant Yuping Huang and was a stockholder in QPhoton, Inc.[8]

---

[4] The facts that follow are limited to those necessary for my decision.
[5] SAC ¶ 29.
[6] *Id.* ¶ 30.
[7] *Id.* ¶ 31.
[8] *Id.* ¶¶ 35, 63.

Defendant Yuping Huang is the Gallaher Associate Professor of Physics and Director of the Center of for Quantum Science and Engineering at Stevens.[9] Huang founded QPhoton, Inc., held a majority of QPhoton Inc.'s stock and served as QPhoton, Inc.'s President, Chief Executive Officer, and Chair of its board of directors.[10]

Defendant Xiao Pan (with Huang, the "Founders") is married to Huang and served as a director on QPhoton, Inc.'s board of directors.[11]

Defendant QPhoton, LLC, is a Delaware limited liability company and the successor of the former Delaware corporation QPhoton, Inc.[12] QPhoton, Inc. was initially formed as a New Jersey limited liability company.[13] For simplicity's sake, I will refer to all iterations of Defendant QPhoton, LLC as "QPhoton."

Defendant Quantum Computing, Inc. ("Quantum") is a Delaware corporation with its principal place of business in Virginia.[14]

Defendant Robert Liscouski was Quantum's Chief Executive Officer, President, and chairman of Quantum's board of directors during all relevant times.[15]

---

[9] *Id.* ¶ 32; Opening Br. of Yuping Huang and Xiao Pan Supp. Mot. Dismiss SAC 1, Dkt. No. 65 ("Founders' OB").
[10] SAC ¶ 33.
[11] *Id.* ¶ 36.
[12] *Id.* ¶ 38.
[13] *Id.* ¶ 60.
[14] *Id.* ¶ 40.
[15] *Id.* ¶ 41.

Defendant Joseph Michael Salvani was a consultant to Quantum during all relevant times.[16]

Defendant Gregory Osborn was a sales consultant for Quantum during all relevant times.[17]

Defendant William McGann is Quantum's Chief Operating Officer and Chief Technology Officer.[18]

Defendant Chris Roberts is Quantum's Chief Financial Officer.[19]

Defendant Dan Walsh (together with Liscouski, McGann, Roberts, Salvani, and Osborn, the "Individual Defendants") is a securities broker with experience in capital markets who serves as a consultant to Quantum.[20]

### 2. Huang Founds QPhoton, Inc., and BV Advisory and Stevens Invest

On January 23, 2020, Huang formed QPhoton.[21] Huang solely owned QPhoton.[22] In early 2020, Stevens introduced Huang to Barksdale and Kotlarz, of BV Advisory.[23] On January 27, 2020, BV Advisory sent Huang an "Indication of

---

[16] *See id.* ¶ 43; Entity Defs.' and Individual Defs.' Opening Br. Supp. Mot. Dismiss Counts I, III–VI, and VIII–X of the SAC 12, Dkt. No. 62 ("Quantum's OB").
[17] *See* SAC ¶ 48; Quantum's OB 12.
[18] SAC ¶ 50.
[19] *Id.* ¶ 53.
[20] *See* SAC ¶ 56; Quantum's OB 12.
[21] SAC ¶ 60. QPhoton was initially formed as a New Jersey limited liability company and later merged into a Delaware corporation. *Id.* ¶¶ 3, 60. Because this distinction is irrelevant to the claims brought by Plaintiff, I will simply refer to the New Jersey limited liability company and Delaware corporation interchangeably as "QPhoton."
[22] *Id.* ¶ 60.
[23] *Id.* ¶ 58.

6

Interest" and term sheet that contemplated a potential investment by BV Advisory into QPhoton in exchange for convertible equity.[24]

By December 2020, Barksdale and Kotlarz brokered a transaction whereby QPhoton acquired a thirty-year license to use seven patents held by Stevens, pursuant to a license agreement (the "Licensed Stevens IP").[25] In exchange, Stevens received equity in QPhoton, as well as various payments and royalties.[26]

In March 2021, QPhoton executed stock purchase agreements with Stevens and BV Advisory.[27] Stevens purchased 555,556 shares of QPhoton's common stock, which represented 9% of QPhoton's equity.[28] BV Advisory purchased 617,284 shares of QPhoton's common stock, representing 10% of QPhoton's equity, pursuant to a stock purchase agreement (the "SPA").[29] During this time, Huang, QPhoton, and BV Advisory also entered into a voting agreement (the "Voting Agreement").[30] Under the terms of the Voting Agreement, Huang and BV Advisory agreed to vote their QPhoton shares to (1) set the size of the board to three directors and (2) appoint one director designated by BV Advisory and two directors designated by a majority of the common stock.[31] To effectuate the Voting Agreement, QPhoton's board of

---

[24] *Id.* ¶ 61; SAC, Ex. 1.
[25] *Id.* ¶ 63.
[26] *Id.*
[27] *Id.* ¶ 65; SAC, Exs. 3–4.
[28] SAC, Ex. 3.
[29] SAC ¶ 70; SAC, Ex. 4.
[30] SAC ¶ 65; SAC, Ex. 5.
[31] SAC ¶ 71; SAC, Ex. 5 §§ 1.1, 1.2.

directors at the time, consisting solely of Huang, executed a written director consent to expand QPhoton's board of directors to three directors and appoint Kotlarz to serve as BV Advisory's board designee and Pan to serve as the other common-stock director.[32] At that time, Kotlarz became QPhoton's Chief Operating Officer.[33]

### 3. The Note Purchase Agreement

On March 1, 2021, QPhoton and BV Advisory executed a note purchase agreement (the "NPA").[34] Under the terms of the NPA, QPhoton authorized the issuance and sale of up to $500,000 in aggregate principal amount of convertible promissory notes to BV Advisory.[35] From March through July 2021, QPhoton issued three convertible notes under the NPA with the collective principal of approximately $500,000 (the "BV Notes").[36]

### 4. The October 2021 Letter of Intent

On October 31, 2021, non-parties Barksdale Global Holdings, LLC ("BGH"), Inference Ventures, LLC ("Inference"), and QPhoton executed a letter of intent and accompanying term sheet (the "October LOI").[37] Barksdale signed on behalf of BGH as its managing member while Kotlarz signed on behalf of Inference as its

---

[32] SAC ¶ 66; SAC, Ex. 7.
[33] SAC ¶ 4.
[34] *Id.* ¶ 65; SAC, Ex. 6.
[35] SAC, Ex. 6 at 5.
[36] SAC ¶ 72; SAC, Ex. 6.
[37] SAC ¶ 127; SAC, Ex. 8.

8

managing member.[38] The October LOI contemplated that BGH and Inference would provide $2.5 million to QPhoton in "Bridge Financing" in exchange for Series A Senior Convertible Preferred Stock.[39] This financing was to occur in at least three tranches: (a) in the first tranche, BGH and Inference would invest $500,000; (b) in the second tranche, another $500,000 would be funded, payable after 60 days and only if QPhoton achieved enumerated milestones; and (c) other subsequent tranches that would be provided "based on mutual agreement of parties pursuant to draw down requests provided by Dr. Huang, including updates to the business plan and mutually agreed product and business milestones."[40] In exchange for this investment, the October LOI provided that BGH and Inference would receive Series A Preferred Stock in QPhoton.[41] The October LOI further provided that, once funded, the October LOI would constitute an "Investor Financing" under the NPA that would trigger the conversion of BV's Notes into equity such that BV Advisory would hold a 45% equity stake in QPhoton.[42] The financing contemplated within the October LOI valued QPhoton at a post-money valuation of $10 million.[43]

On July 31, 2022, after QPhoton was acquired by Quantum, BGH and Inference entered into an Assignment and Assumption Agreement with BV

---

[38] SAC, Ex. 8.
[39] *Id.*
[40] *Id.*
[41] *Id.*
[42] *Id.*
[43] *Id.*

Advisory that assigned certain enumerated financial documents related to BGH and Inference's investments in QPhoton to BV Advisory.[44]

### 5. Quantum and QPhoton Began Merger Discussions

In fall 2021, BV Advisory identified Quantum as a potential counterparty to acquire QPhoton.[45] Initially, Barksdale and Kotlarz led the merger negotiations with Quantum on behalf of QPhoton.[46] On November 10, 2021, Barksdale and Kotlarz met with some of the Individual Defendants, including Salvani, Osborn, Liscouski, and McGann.[47] At that time, Barksdale and Kotlarz agreed on behalf of QPhoton to a stock-for-stock merger with an exchange ratio resulting in QPhoton's stockholders owning 49% of the post-merger company and Quantum's stockholders owning the remaining 51% of the post-merger company.[48] These terms were memorialized in a non-binding merger term sheet that was executed on November 15, 2021 (the "Merger Term Sheet").[49]

### 6. Negotiations with Barksdale and Kotlarz Break Down

Sometime in November 2021, BV Advisory informed Defendants that BV Advisory planned on appointing an unnamed individual referred to as the "Former

---

[44] *See* Transmittal Aff. of Julie M. O'Dell Supp. Pl.'s Answering Br. in Opp'n to Entity Defs.' and Individual Defs.' Mot. to Dismiss, Ex. A, Dkt. No. 68 (the "Assignment and Assumption Agreement").
[45] SAC ¶ 87.
[46] *See id.* ¶¶ 87–95.
[47] *Id.* ¶ 91.
[48] *Id.* ¶¶ 91–92.
[49] *Id.* ¶ 12.

Apple Executive" to the post-merger company's board of directors.[50] Shortly before Thanksgiving, BV Advisory hosted a videoconference with the Former Apple Executive, Huang, Liscouski, McGann, and Kotlarz to discuss the prospect of the Former Apple Executive joining the post-merger company's board of directors.[51]

Around this same time, Quantum took out an $8 million loan.[52] When BV Advisory learned about the loan in December 2021, BV Advisory raised concerns about Quantum's acceptance of the loan and Quantum's subsequent offer to extend a loan to QPhoton during merger negotiations.[53] Thereafter, the Individual Defendants, on behalf of Quantum, stopped returning BV Advisory's calls and instead began to negotiate the potential merger with Stevens and Huang directly.[54] By this time, BV Advisory had flagged just two remaining issues to be resolved before QPhoton could sign a definitive merger agreement: (1) Quantum's $8 million loan and (2) a potential reverse break-up fee for the benefit of QPhoton.[55]

7. Huang Negotiates with Quantum and the Merger is Finalized

On January 2, 2022, Liscouski informed BV Advisory that Quantum was no longer interested in acquiring QPhoton.[56] The next day, however, Huang informed

---

[50] *Id.* ¶ 97.
[51] *Id.* ¶ 98.
[52] *See id.* ¶ 100.
[53] *Id.* ¶ 102.
[54] *Id.* ¶ 105.
[55] *Id.* ¶ 106.
[56] *Id.* ¶ 108.

BV Advisory that Quantum was in fact still interested in consummating a merger.[57] At this point, Huang took over the direct negotiations with Quantum, and BV Advisory was excluded from the discussions.[58]

During the merger negotiations, Quantum and QPhoton agreed that Quantum would provide QPhoton with interim financing pursuant to a note purchase agreement (the "Quantum NPA").[59] Quantum purchased two $1.25 million notes from QPhoton (the "Quantum Notes").[60] A portion of these proceeds was used to pay Huang an annual salary of approximately $240,000, when Huang had previously not received a salary from QPhoton.[61]

On May 19, 2022, Quantum, QPhoton, Huang, and two Quantum merger subsidiaries entered into a merger agreement (the "Merger Agreement").[62] The terms of the Merger Agreement tracked the Merger Term Sheet executed in November 2021, including that the merger would be a stock-for-stock merger with QPhoton's stockholders receiving 49% of the combined company's outstanding shares.[63] Based upon the closing price of Quantum's stock on May 26, 2022, the total cash value of the merger consideration was worth approximately $62.1

[57] *Id.* ¶ 109.
[58] *Id.*
[59] *Id.* ¶ 115.
[60] *See id.* ¶ 35; Quantum's OB, Ex. J.
[61] SAC ¶¶ 115–16.
[62] *Id.* ¶¶ 39, 138.
[63] Quantum's OB, Ex. K at § 3.01(b).

million.[64]   In connection with the merger, Huang was extended an employment agreement to serve as the Chief Quantum Officer[65] ("CQO") of Quantum.[66] As the CQO, Huang was to receive a $400,000 annual salary and stock options to purchase up to 400,000 shares of Quantum common stock.[67]   Huang also received $300,000 worth of Quantum stock awards in connection with the merger.[68]

Upon learning that the Merger Agreement had been approved, Barksdale began sending emails objecting to the merger and threatening litigation.[69]   After receiving these emails, QPhoton retained Rolnick Kramer Sadighi LLP ("Rolnick Kramer") as special counsel to defend against litigation brought in connection with the merger.[70]   On May 26, 2022, Huang emailed Pan and Kotlarz to notice a special board meeting.[71]   Attached to the email was a proposed board resolution concerning the formation of a special committee to address any pending or threatened legal action in connection with the Merger Agreement.[72]   The next day, QPhoton's board of directors held a meeting, at which the special committee ("Special Committee")

---

[64] SAC, Ex. 10.
[65] Chief Quantum Officer: to quote President Biden, "not kidding."
[66] SAC ¶ 133; SAC, Ex. 9.
[67] SAC ¶ 133.
[68] *Id.* ¶ 117.
[69] Quantum's OB, Ex. M.
[70] Entity Defs.' and Individual Defs.' Reply Br. Supp. Mot. Dismiss ("Quantum's RB"), Ex. A.
[71] *See* SAC ¶ 114; Quantum's RB, Ex. B.
[72] *See id.*

was formed.[73] The meeting minutes reflect that Kotlarz was in attendance.[74] Kotlarz explained that his understanding of the Voting Agreement allowed him to serve on all committees formed by QPhoton's board of directors.[75] Counsel from Rolnick Kramer explained that, because Kotlarz was the board designee of the stockholder threatening the litigation to which the Special Committee was formed to respond, any such provision in the Voting Agreement was waived because Kotlarz's service on the Special Committee would be a conflict of interest.[76] The formation of the Special Committee, consisting of Huang and Pan, was approved on May 27, 2022, with Huang and Pan voting in favor and Kotlarz voting against the resolution.[77]

With reference to the facts regarding the Special Committee just disclosed, they are taken from the Complaint, documents referenced therein, and from a stipulated timeline provided at my request, once I proved unable at oral argument to comprehend[78] a linear account of the facts. Plaintiff agrees in that timeline that the Special Committee was created post-merger-agreement but does not concede the purpose I have described above; the timeline, however, belies the assertion of the Complaint that the purpose of the Special Committee was to exclude Plaintiff's

---

[73] Quantum's RB, Ex. A.
[74] Id.
[75] Id.
[76] Id.
[77] Id.
[78] Not, alas, a unique experience.

designee from negotiation of a merger agreement. In conducting my analysis under Rule 12(b)(6), below, I assume the facts are as I have relayed them here.

### 8. Merger Closes, QPhoton Pays the BV Notes, and BV Advisory Seeks Appraisal

On June 2, 2022, QPhoton sent its stockholders a notice of appraisal rights (the "Notice").[79] The Notice stated that the stockholders would not be issued their portion of the merger consideration until the stockholders executed and delivered certain documents, including a joinder agreement ("Joinder Agreement") whereby the stockholder agreed to be bound by the terms of the Merger Agreement.[80] The Joinder Agreement also included a general release for the benefit of QPhoton, Quantum, and their directors and officers.[81] BV Advisory did not execute the Joinder Agreement and did not accept its portion of the merger consideration.[82] Instead, BV Advisory filed an appraisal petition in the Court of Chancery.[83]

On June 16, 2022, the merger between Quantum and QPhoton closed.[84] As a result of the merger, QPhoton became a wholly-owned subsidiary of Quantum.[85] In anticipation of the merger's closing, Stevens agreed to assign the Licensed Stevens

---

[79] SAC ¶ 160; SAC, Ex. 10.
[80] SAC, Ex. 10.
[81] *Id.*
[82] SAC ¶ 160.
[83] *Id.*; *see also* Pet. for Appraisal, *BV Advisory P'rs, LLC v. QPhoton, LLC*, C.A. No. 2022-0923-SG, Dkt. No. 1.
[84] SAC ¶ 17.
[85] *Id.* ¶¶ 38–39.

IP to the post-merger company upon the consummation of the merger.[86]  Also in connection with the closing of the merger, QPhoton sent a cashier's check in the amount of $535,684.28 to BV Advisory.[87]  The letter enclosing the cashier's check informed BV Advisory that the cashier's check was paid pursuant to Section 5(d) of the NPA and was meant to fully satisfy the BV Notes purchased from QPhoton.[88]  To support the amount paid via the cashier's check, the letter included the interest calculations for the BV Notes.[89]

*B. Procedural History*

BV Advisory initiated this action on August 15, 2022.[90]  On December 13, 2022, BV Advisory filed its first amended complaint.[91]  BV Advisory filed a motion for leave to file a second amended complaint on March 17, 2023,[92] and I entered a stipulated order granting the requested leave.[93]  The second amended complaint (the "Complaint") was filed on March 24, 2023.[94]  The Complaint asserts claims for (1) breach of the Voting Agreement; (2) breach of the NPA and the BV Notes; (3) breach

---

[86] Quantum's OB, Ex. O at 9.

[87] SAC, Ex. 11.

[88] Jan. 12, 2024 Letter from Counsel for the Parties re Requested Timeline (the "Stipulated Timeline"), Defs.' Ex. A to Timeline of Allegations in Pl.'s SAC, Dkt. No. 101.

[89] Stipulated Timeline, Ex. A.

[90] *See* Verified Compl. for Breach of Fiduciary Duty, Aiding and Abetting, Breach of Contract, and Other Relief, Dkt. No. 1.

[91] *See* Verified Am. Compl. for Breach of Fiduciary Duty, Aiding and Abetting, Breach of Contract, and Other Relief, Dkt. No. 39.

[92] *See* Pl.'s Mot. for Leave to File Second Am. Compl., Dkt. No. 56.

[93] *See* Granted (Stipulation and [Proposed]) Order Permitting Filing of Second Am. Compl., Dkt. No. 60.

[94] *See* SAC.

of the October LOI; (4) tortious interference with the Voting Agreement; (5) tortious interference with the NPA and the BV Notes; (6) tortious interference with the October LOI; (7) breach of fiduciary duty; (8) aiding and abetting breach of fiduciary duty; (9) fraudulent transfer; and (10) unjust enrichment.[95]

Quantum, QPhoton, and the Individual Defendants moved to dismiss counts I, III–VI, and VIII–X of the Complaint on March 31, 2023, under Rule 12(b)(6).[96] There was no motion to dismiss the claim for breach of NPA. The Individual Defendants also moved to dismiss the claims asserted against them, under Rule 12(b)(2) for lack of personal jurisdiction.[97] That same day, the Founders filed a motion to dismiss the Complaint under Rule 12(b)(6), seeking to dismiss the fiduciary duty breach claims in Count VII.[98] The briefing on the motions to dismiss was completed on May 19, 2023.[99] I heard oral argument on the motions on October 11, 2023.[100] At the hearing, I advised the parties I would not consider the matter submitted until the parties provided the Court with a stipulated timeline of events.[101]

---

[95] *Id.* ¶¶ 163–208.

[96] *See* Quantum's OB.

[97] *Id.* at 48–51.

[98] *See* Founders' OB.

[99] *See* Quantum's RB; Reply Br. of Yuping Huang and Xiao Pan Supp. Mot. to Dismiss, Dkt. No. 79 ("Founders' RB").

[100] *See* Judicial Action Form re Oral Argument before Vice Chancellor Sam Glasscock dated 10.11.23, Dkt. No. 90.

[101] Tr. of 10-11-2023 Oral Argument on Mots. to Dismiss and Mot. to Expedite 49:24–50:7, Dkt. No. 91.

The stipulated timeline was submitted to the Court on January 12, 2024, and I consider the matter submitted as of that date.[102]

## II. ANALYSIS

While the facts are laid out above in weary detail, I find that a brief recapitulation of the facts is helpful to orient the reader before analyzing the instant motions. Put simply, Plaintiff sought to make an investment in QPhoton. To effectuate that investment, Plaintiff entered into a Voting Agreement with Huang and QPhoton that caused Huang to increase QPhoton's board size and appoint Plaintiff's designee as a director. Plaintiff's board designee was to be given the right to participate in all committees formed by QPhoton's board of directors. Thereafter, Plaintiff and QPhoton entered a Note Purchase Agreement whereby Plaintiff could, and did, purchase $500,000 worth of convertible promissory notes from QPhoton, which would convert to equity upon an "Investor Financing;" such conversion would result in BV Advisory owning 45% of QPhoton's equity. Months later, QPhoton and affiliates of Plaintiff executed the October LOI that contemplated an "Investor Financing" of $2.5 million investment in QPhoton, which never materialized. Rights under this October LOI was allegedly assigned to Plaintiff in July 2022, *after* QPhoton's merger with Quantum.

---

[102] *See* Stipulated Timeline.

18

Plaintiff's Complaint centers on that merger.  According to Plaintiff, *Plaintiff* identified Quantum as a potential merger partner.  Plaintiff[103] then led the merger negotiations and entered the Merger Term Sheet with Quantum on behalf of QPhoton.  It was at this time, however, that Plaintiff began to raise concerns about certain aspects of Quantum's business.  Upon Plaintiff raising these concerns, Quantum stopped negotiating with Plaintiff and instead negotiated directly with Huang.  Plaintiff alleges Quantum was able to strong-arm Huang into entering an unfair merger transaction that undervalued QPhoton to the detriment of Plaintiff, and that QPhoton breached Plaintiff's contractual right to accelerate the October LOI "Investor Financing" to acquire 45% of QPhoton's equity, as promised under the Note Purchase Agreement.  After Huang caused QPhoton to enter the merger agreement with Quantum, Barksdale threatened to sue; the QPhoton Board then formed the Special Committee to deal with these threats.  Plaintiff's board designee, Kotlarz, was excluded from the Special Committee, an act which, per Plaintiff, breached the Voting Agreement.[104]

---

[103] I use "Plaintiff" here to designate BV Advisory's principal, Barksdale, and its nominee to the QPhoton Board, Kotlarz.

[104] The SAC asserts that this Special Committee was formed to exclude Kotlarz from the *merger negotiations*.  *See* SAC ¶¶ 36, 113–14.  However, in response to my request for the parties to create a stipulated timeline of facts, Plaintiff now contends that the Special Committee was formed a week *after* the merger agreement was signed.  *See* Stipulated Timeline 10.  Despite agreeing to this timeline of events, Plaintiff asserts that the purpose and actual function of the Special Committee remain disputed issues of fact.  *See id.* at 11 n.8.

All defendants have moved to dismiss the Complaint under Rule 12(b)(6) for failure to state a claim. The Individual Defendants also oppose this Court asserting personal jurisdiction over them, moving to dismiss the Complaint under Rule 12(b)(2). Before I turn to whether the Complaint states cognizable claims, I will first deal with the threshold matter of whether this Court has personal jurisdiction over the Individual Defendants. It is undisputed that none of the Individual Defendants is a resident of Delaware.

*A. Rule 12(b)(2) – Personal Jurisdiction Over the Individual Defendants*

"When personal jurisdiction is challenged by a motion to dismiss pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the nonresident defendant."[105] "If the court has not conducted an evidentiary hearing, then a plaintiff 'need only make a *prima facie* showing, in the allegations of the complaint, of personal jurisdiction and the record is construed in the light most favorable to the plaintiff.'"[106] The Court invokes a two-step test to determine whether it can exercise personal jurisdiction over a nonresident defendant. "First, the court must consider whether the Delaware Long Arm Statute applies[.]"[107] Second, the Court must conduct a due process

---

[105] *Werner v. Miller Tech. Mgmt., L.P.*, 831 A.2d 318, 326 (Del. Ch. 2003).
[106] *Harris v. Harris*, 289 A.3d 310, 326 (Del. Ch. 2023) (quoting *Spring Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008)).
[107] *Werner*, 831 A.2d at 326.

inquiry to determine if the "nonresident defendant has sufficient minimum contacts with Delaware" such that she could foresee being haled into our courts.[108]

The Individual Defendants are not residents of Delaware. They are all affiliated with Quantum, the acquirer in the merger. The Individual Defendants consist of Liscouski, Quantum's CEO, President, and Chairman of the board; Salvani, a consultant to Quantum; Osborn, a sales consultant for Quantum; McGann, Quantum's COO and CTO; Roberts, Quantum's CFO; and Walsh, a securities broker who serves a consultant to Quantum.[109] Quantum itself is a Delaware corporation with its principal place of business in Virginia.[110] At all relevant times for purposes of this portion of this analysis, QPhoton was a Delaware corporation with its principal place of business in New Jersey.[111] Plaintiff has but one theory of jurisdiction; it contends that the Individual Defendants are subject to personal jurisdiction in Delaware "because they conspired with the Delaware entities and took actions in Delaware to further their plan to steal from [BV Advisory]."[112] The Individual Defendants may be subject to personal jurisdiction in Delaware under the conspiracy theory of jurisdiction upon a factual showing that:

> (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance

---

[108] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1228 (Del. 2018).
[109] *See supra* Section I.A.1.
[110] *See id.*
[111] *See id.*
[112] SAC ¶ 158.

of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[113]

At the motion to dismiss stage, an inference of conspiracy requires that the plaintiff plead "facts supporting: (i) the existence of a confederation or combination of two or more persons; (ii) that an unlawful act was done in furtherance of the conspiracy [in this state]; and (iii) that the conspirators caused actual damage to the plaintiff."[114]

The conspiracy theory of jurisdiction "is not an independent jurisdictional basis."[115] Rather, "it is a shorthand reference to an analytical framework where a defendant's conduct that either occurred or had a substantial effect in Delaware is attributed to a defendant who would not otherwise be amenable to jurisdiction in Delaware."[116] "[T]he conspiracy theory of personal jurisdiction is very narrowly construed to prevent plaintiffs from circumventing the minimum contacts requirement."[117] There must still be a statutory basis for personal jurisdiction over at least one conspirator before this Court will assert personal jurisdiction over fellow conspirators.[118] Since Delaware's long-arm statute "confers specific, not general,

---

[113] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).
[114] *Harris*, 289 A.3d at 339 (citation omitted).
[115] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 976 (Del. Ch. 2000)
[116] *Id.* (internal quotations and citation omitted).
[117] *Morrison v. Berry*, 2020 WL 2843514, at *13 (Del. Ch. June 1, 2020) (alterations and quotations omitted).
[118] *See Lacey v. Mota-Velasco*, 2020 WL 5902590, at *6 (Del. Ch. Oct. 6, 2020).

jurisdiction, formation of a Delaware entity may only serve as the basis for personal jurisdiction where there is a sufficient nexus between that formation and the alleged wrongful conduct."[119]

Plaintiff asserts that the Individual Defendants conspired with Quantum and QPhoton, both Delaware entities, to exclude Plaintiff from merger negotiations after Plaintiff began to ask questions about Quantum's business practices.[120] As a result of this conspiracy to exclude Plaintiff from the merger negotiations, Plaintiff alleges that the Founders wrongfully retained a 35% interest in QPhoton that Plaintiff asserts belonged to it.[121] According to Plaintiff, in consideration of these ill-gotten gains, the Founders were willing to enable Quantum to acquire QPhoton for significantly less than "every valuation to date."[122] Plaintiff contends that the central act that resulted in the alleged harm Plaintiff suffered was the subsequent merger, which was structured as a triangular merger that utilized two Quantum subsidiaries, both Delaware entities.[123] Liscouski signed the Merger Agreement on behalf of the two Quantum subsidiaries.[124]

---

[119] *Lone Pine Res., LP v. Dickey*, 2021 WL 2311954, at *5 (Del. Ch. June 7, 2021) (citations omitted).

[120] Pl.'s Answering Br. Opp'n to Entity Defs.' and Individual Defs.' Mot. to Dismiss SAC 47–48, Dkt. No. 68 ("Pl.'s AB Opp'n Quantum's MTD").

[121] *Id.* at 48.

[122] *Id.*

[123] *Id.* at 48–49.

[124] *Id.* at 49 n.8.

The Individual Defendants submit that the allegations in the Complaint are insufficient to establish personal jurisdiction over them under the conspiracy theory of jurisdiction. Specifically, the Individual Defendants assert that the Complaint fails to plead a meeting of the minds related to any wrongful conduct because Plaintiff failed to assert any well-pled allegations that the merger negotiations were anything other than arm's-length.[125] Moreover, according to the Individual Defendants, the Complaint fails to allege any action taken by any of the Individual Defendants in furtherance of the alleged conspiracy that occurred in Delaware, let alone an action that was a vital step in the alleged conspiracy.[126] At most, the Complaint alleges that Liscouski filed a "certificate of merger" with the Delaware Secretary of State, but that occurred (per the Complaint) on December 16, 2021, at a time when Plaintiff's principal, Barksdale, and its board designee Kotlarz, were still negotiating the merger with Quantum.[127] The filing of the Certificate was not in furtherance of any conspiracy to cut BV Advisory out of the negotiation, in other words. The QPhoton-Quantum merger did not close until six months later in June

---

[125] Quantum's OB 49.
[126] *Id.* at 50; Quantum's RB 28 (citing *Reid v. Siniscalchi*, 2014 WL 6589342, at *11 (Del. Ch. Nov. 20, 2014)).
[127] *See* SAC ¶ 42. I suspect the Complaint means to aver that Liscouski filed a Certificate of Incorporation in Delaware, to create an entity to facilitate the merger. But the then-contemplated merger is not the subject of the alleged conspiracy; under Plaintiff's theory, it was not until *after* Plaintiff questioned Quantum's business decisions, during the negotiations, that Plaintiff was wrongly frozen out of the negotiations. Whatever torts inhere in that action, they are not related to the filing of the "Certificate of Merger" in Delaware.

2022.[128]  The Individual Defendants contend that the filing of the Certificate in Delaware, without more and under these facts, cannot form the basis for personal jurisdiction over them.[129]  I agree.

While Plaintiff is only required to make a *prima facie* showing that this Court can assert personal jurisdiction over the Individual Defendants, Plaintiff has failed to do so.  Throughout the Complaint, Plaintiff summarily states that its exclusion from the merger negotiation was a "conspiracy."[130]  The Complaint, however, does not allege any action taken by any Individual Defendant or any of their alleged co-conspirators taken in furtherance of this alleged conspiracy to freeze Plaintiff out of the merger negotiations, *in Delaware*.  At most, Plaintiff states that the two Quantum subsidiaries used to effectuate the merger were both Delaware entities.  This fact, standing alone, is insufficient to support an inference that the *creation* of the Delaware subsidiaries was a necessary step to complete the conspiracy or done as part of a wrongful scheme.[131]  The harm that Plaintiff alleges it suffered did not occur

---

[128] Quantum's OB 50–51 & n.23.  Roberts is also alleged to have filed Quantum's 2018 amended articles of incorporation and a November 2021 certificate of designation with the Delaware Secretary of State.  SAC ¶ 54.

[129] Quantum's OB 51.

[130] *See* SAC ¶¶ 15, 18, 28, 31, 112, 119, 144 (asserting that Quantum and the Individual Defendants conspired with QPhoton and the Founders to harm Plaintiff).

[131] *See, e.g., Microsoft Corp. v. Amphus*, 2013 WL 5899003, at *9 (Del. Ch. Oct. 31, 2013) (finding personal jurisdiction over a director who proposed the creation of a Delaware entity of which he would be the founder, director, and CEO and hold a 20% stake in the new entity, representing threefold increase in his personal interest gained at an unfair price because the director had purposefully misled his fellow directors to achieve his goal); *Virtus Cap. L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *14 (Del. Ch. Feb. 11, 2015) (finding personal jurisdiction over a defendant who caused the creation of liquidating vehicles to allegedly maintain voting control of

25

because a merger was effectuated using Delaware entities; rather, the harm alleged by Plaintiff arises from being deprived of its alleged contractual rights under the Voting Agreement, NPA, and October LOI, once its principals were excluded from the merger negotiations in early 2022.[132]   Subjecting any of the Individual Defendants to personal jurisdiction based on their unspecified actions as buyer's agents in the merger would also offend due process.[133]   Accordingly, I find that this Court lacks personal jurisdiction over the Individual Defendants.

## B. Rule 12(b)(6) – Failure to State a Claim

"On a motion to dismiss, the court applies a plaintiff-friendly standard of review, under which a plaintiff need only establish that its claims are reasonably conceivable."[134]  However, the Court is only required to accept "well-pleaded factual allegations in the Complaint" and only draws "reasonable inferences in favor of the plaintiff."[135]  Because Delaware is a notice-pleading jurisdiction, "[a]n allegation, though vague or lacking in detail, is nevertheless 'well-pleaded' if it puts the

---

an entity in extreme financial distress as part of his efforts to obtain liquidity for another group of entities that the defendant controlled).

[132] *See, e.g.*, SAC ¶¶ 18, 31, 119, 144 (alleging BV Advisory was deprived of its contractual rights).

[133] As noted by the Individual Defendants in their reply brief, the Complaint fails to make any person-by-person allegation as to the actions that the Individual Defendants took in concert to conspire against Plaintiff.  Quantum's RB 27.  This group pleading is impermissible and further supports dismissal because "there are no well-pled facts to suggest any wrongdoing by [any individual] defendant."  *NuVasive, Inc. v. Miles*, 2020 WL 5106554, at *8 (Del. Ch. Aug. 31, 2020).

[134] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio*, 251 A.3d 212, 262 (Del. Ch. 2021).

[135] *City of Fort Myers Gen. Emps.' Pension Fund v. Haley*, 235 A.3d 702, 706 (Del. 2020).

opposing party on notice of the claim brought against it."[136]   However, the Court should not "accept every strained interpretation of the allegations, credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor."[137]  A "claim may be dismissed if allegations in the complaint or in the exhibits incorporated into the complaint effectively negate the claim as a matter of law."[138]

### 1. Counts I and III: Breach of Contract

"In order to survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."[139]   "When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language."[140]  "[A] contract's construction should that which would be understood by an objective, reasonable third party."[141]

---

[136] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003).

[137] *City of Fort Myers Gen. Emps.' Pension Fund*, 235 A.3d at 706; *see also Crescent/Mach I P'rs, L.P.*, 846 A.2d at 972 (the Court must "disregard allegations which are merely conclusory and lack factual support.").

[138] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[139] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

[140] *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021).

[141] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

### a. Count I: Breach of the Voting Agreement

Plaintiff alleges that QPhoton and Huang breached the Voting Agreement by proceeding with merger negotiations and the subsequent merger transaction without informing BV Advisory's board designee, Kotlarz; forming the Special Committee (sans Kotlarz) to proceed with a potential merger; and excluding Kotlarz from all information and governance decisions involved in entering the Merger Agreement and closing the merger.[142] In response, QPhoton and Huang assert that Section 1.7 of the Voting Agreement is not a self-executing provision; the Voting Agreement requires Huang to cause QPhoton to put in place a three-director board, and that one of those directors be BV Advisory's designee. This provision was complied with. Defendants also argue BV Advisory's board designee had a right to affirmatively seek appointment to any board committees, which the Complaint does not adequately plead Kotlarz sought to do with respect to the Special Committee,[143] and points out that the only "special committee" formed was created after the merger agreement was entered, to deal with Barksdale's litigation threats. QPhoton and Huang also contend that the Voting Agreement only obligated Huang to cause Kotlarz to be appointed to QPhoton's board of directors; it did not provide BV

---

[142] Pls.' AB Opp'n Quantum's MTD 22–23.
[143] Quantum's OB 23.

Advisory with information rights.[144]  The two sections of the Voting Agreement that undergird Count I are Sections 1.7 and 2.1.[145]

### i. Section 1.7 of the Voting Agreement

Section 1.7 is entitled "Board Committees" and states: "The BV Advisory Director shall be entitled *in such person's discretion* to be a member of any Board committee."[146]  Plaintiff alleges that QPhoton and Huang formed the Special Committee for one purpose: to exclude Kotlarz from merger negotiations with Quantum.[147]  According to the Complaint, neither Plaintiff nor Kotlarz learned of the Special Committee until May 26, 2022, a week after the Merger Agreement was executed.[148]  Upon learning of the Special Committee, Plaintiff objected to Kotlarz's exclusion.[149]

Under the incorporation-by-reference doctrine, at the pleading stage, "the Court may consider . . . documents that are 'integral' to the complaint" and those documents that are incorporated by reference in the complaint.[150]  Since the formation of the Special Committee is a key aspect of BV Advisory's breach of contract claim as it pertains to Section 1.7 of the Voting Agreement, I will consider

---

[144] *Id.* at 24.
[145] Pls.' AB Opp'n Quantum's MTD 23–26.
[146] SAC, Ex. 5 § 1.7 (emphasis added).
[147] Pls.' AB Opp'n Quantum's MTD 23.
[148] *Id.*
[149] *Id.* at 24.
[150] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).

29

the meeting minutes for the board meeting during which the Special Committee was formed.[151] The meeting minutes for the special meeting of QPhoton's board of directors (the "Meeting Minutes") states that Huang, Pan, and Kotlarz were all in attendance at the May 27, 2022 board meeting.[152] Per the agenda for the special meeting, QPhoton's board of directors considered and voted on whether to form a special committee of the board.[153] The Meeting Minutes further reflect that Kotlarz was present for and voted against the formation of the Special Committee.[154]

The Meeting Minutes confirm Plaintiff's allegation that neither Plaintiff nor Kotlarz knew of the Special Committee before May 26, 2022; that is because, as the Meeting Minutes also reflect, the Special Committee had not yet been considered, voted on, or formed until May 27, 2022.[155] Plaintiff cannot succeed on their breach of contract claim for QPhoton's alleged failure to inform Plaintiff or Kotlarz of the existence of the Special Committee because Plaintiff and Kotlarz were informed prior to the creation of the Special Committee, an act that Kotlarz himself voted

---

[151] I also note that Plaintiff has seemingly acquiesced to my consideration of the meeting minutes because Plaintiff has not objected to the minutes' inclusion in the Stipulated Timeline. Plaintiff's objection in the Stipulated Timeline is limited to what the true purpose and actual function of the Special Committee were; however, Plaintiff failed to plead and brief this aspect of their claim. *Compare* Stipulated Timeline 11 n.8, *with* SAC ¶¶ 163–68, *and* Pl.'s AB Opp'n Quantum's MTD 23–24.
[152] Quantum's RB, Ex. A.
[153] *Id.*
[154] *Id.*
[155] *Id.*

30

against.[156]  Plaintiff's core argument is that Kotlarz was denied a seat on the Special Committee, which allowed the Special Committee to negotiate an unfair merger without Plaintiff's involvement, via Kotlarz, in violation of BV Advisory's contractual right.  At oral argument on the motion to dismiss, it became clear that the parties were in fundamental disagreement about the timing and purpose of the formation of the Special Committee.  I asked the parties to stipulate to a timeline, which they helpfully did.  This shows that Plaintiff's assertion that the Special Committee was formed to negotiate the merger with Quantum cannot be well-pled: Plaintiff also alleges that Quantum and QPhoton had already executed the Merger Agreement on May 19, 2022, *a week prior to the board resolution that formed the Special Committee*.[157]  It is unreasonable to infer that the Special Committee, created *after* the Merger Agreement was executed, was intended to freeze Plaintiff and Kotlarz out of the merger negotiations.  To the extent that Count I relies on a breach of Section 1.7 of the Voting Agreement, Plaintiff has failed to state a cognizable claim for breach of contract.

ii. Section 2.1 of the Voting Agreement

Section 2.1 of the Voting Agreement is entitled "Covenants of the Company" and provides the following:

---

[156] *Id.*
[157] *Compare* SAC ¶ 113, *with* SAC ¶ 39.

31

The Company agrees to use its best efforts, within the requirements of applicable law, to ensure that the rights granted under this Agreement are effective and that the parties enjoy the benefits of this Agreement. Such actions include, without limitation, the use of the Company's best efforts to cause the nomination and election of the directors as provided in this Agreement.[158]

Plaintiff contends that QPhoton breached Section 2.1 of the Voting Agreement by failing to use its best efforts to ensure that Plaintiff's rights to participate in QPhoton's governance through its appointed director were effectuated.[159] Specifically, Plaintiff asserts that Kotlarz was cut out of QPhoton's governance decisions because QPhoton failed to provide Kotlarz with information that he was entitled to as a director.[160] QPhoton and Huang aver that the Voting Agreement only obligated Huang to cause Kotlarz to be appointed as a director to QPhoton's board of directors, which Huang did.[161]

Plaintiff is correct that as a director of a Delaware corporation, Kotlarz had statutory rights to receive information under 8 *Del. C.* § 220 and could assert his rights thereunder if he was not receiving the information to which he was statutorily entitled.[162] However, the Voting Agreement could have, but did not, provide

---

[158] SAC, Ex. 5 § 2.1.
[159] Pl.'s AB Opp'n Quantum's MTD 24.
[160] *Id.* at 24–26.
[161] Quantum's OB 24.
[162] *See Chammas v. NavLink, Inc.*, 2016 WL 767714, at *6 (Del. Ch. Feb. 1, 2016) (explaining that, as a fiduciary to the corporation, a director has "virtually unfettered" access to the corporation's books and records in order to fulfill their fiduciary obligations owed to the corporation).

*Plaintiff* with information rights consonant with or beyond those of any director. Neither did the Voting Agreement grant Plaintiff standing to assert Kotlarz's information rights as a director. The Voting Agreement gave Plaintiff the right to have its director nominee appointed to QPhoton's board of directors, which he was. Plaintiff cannot assert statutory rights to information that belong to Kotlarz, rather than Plaintiff itself.[163] While Section 2.1 of the Voting Agreement provides that QPhoton would use its best efforts to ensure "the rights granted under" the Voting Agreement, the Voting Agreement did not provide *Plaintiff* the right to participate in merger negotiations.[164] To the extent Plaintiff's breach of contract claim relies upon its allegations of a breach of Section 2.1 of the Voting Agreement, Plaintiff has failed to state a claim.

Plaintiff has failed to state a claim for breach of the Voting Agreement. Accordingly, Count I is dismissed.

I note that a breach of duty claim against two of the three members of the QPhoton Board survives the motion to dismiss, as discussed *infra*. The fact that I have dismissed this *contract* claim based on the allegations that Kotlarz was

---

[163] *See Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *9 n.33 (Del. Ch. July 24, 2009) (information rights "are routinely negotiated for, and are not a proper subject for a claim for breach of" contract claim. "Absent contractual information rights, the stockholder must rely on 8 *Del. C.* § 220 as a basis for rights to certain information.")

[164] *See, e.g., Huff Energy Fund, L.P. v. Gershen*, 2016 WL 5462958, at *10–11 (Del. Ch. Sept. 29, 2016) (dismissing a claim for breach of contract based on a comparable provision in a shareholders agreement where plaintiff did not allege that the contract provided for the "right" in question).

excluded from the merger negotiations does not exclude these allegations from consideration as a part of the breach of duty cause of action, as appropriate.

### b. Count III: Breach of the October LOI

Plaintiff next asserts that QPhoton breached the October LOI by refusing to honor Plaintiff's rights to purchase equity, despite Plaintiff being ready, willing, and able to fund the October LOI.[165] Plaintiff, BV Advisory, was not a party to the October LOI, however. QPhoton advances two arguments in favor of dismissing Count III, arguing that (a) BV Advisory lacks standing to enforce the October LOI; and (b) QPhoton did not breach an obligation contained in the October LOI.[166]

The parties to the October LOI are QPhoton, BGH, and Inference.[167] The October LOI contemplated that BGH and Inference (the "Investors") would invest $2.5 million in QPhoton in exchange for Series A Senior Convertible Stock, to be funded in a series of at least three tranches.[168] The first two tranches are each for $500,000 and any subsequent tranches were to be based on mutual agreement of the parties to the October LOI pursuant to requests made on behalf of QPhoton by Huang.[169] The October LOI also provides that "[t]he full $2,500,000 Bridge

---

[165] SAC ¶ 175.
[166] Quantum's OB 25–31; Quantum's RB 7 n.3 (dropping its argument that the October LOI was not a contract because of lack of acceptance as Plaintiff has produced a fully executed version of the October 2021).
[167] *See* SAC, Ex. 8.
[168] *Id.*
[169] *Id.*

Financing Round will be at a post-money valuation of $10,000,000 . . . and any remaining tranches of the investment round may be accelerated at any time at the sole discretion of Investors at this agreed post money valuation."[170] "Investors" is a defined term that includes BGH, Inference, and "a group of certain Qualified Investors [(the "Investors")], individually or through BGI Finance Corp., a special purpose vehicle[.]"[171] It does not include Plaintiff. None of the Investors is a party to this litigation.

Plaintiff alleges, and a plaintiff-friendly reading would support,[172] that the Investors had the right to initiate the timing of financing of the October LOI. The Complaint is silent to the Investors' attempts to fund the October LOI, however. Instead, the Complaint alleges that *BV Advisory*, a non-party to the October LOI, repeatedly attempted to exercise the Investors' rights under the October LOI. BV Advisory points out that it is the beneficiary of the Assignment and Assumption agreement it entered with the Investors. Its attempts to exercise rights under the October LOI, however, occurred in December 2021 and continued into January 2022, starting and ending well before the Assignment and Assumption Agreement was executed, in July 2022.[173] There are no non-conclusory allegations in the

---

[170] *Id.*
[171] *Id.*
[172] Defendants read the contract differently; given my decision here, I need not address the dispute.
[173] *See* SAC ¶¶ 127, 142–43.

35

Complaint that BV Advisory had the authority to exercise rights belonging to the *Investors*. Plaintiff has not adequately alleged that QPhoton refused to cooperate with the Investors, nor are there any other allegations that QPhoton frustrated the Investors' rights under the October LOI before the merger. Plaintiff has not alleged that the October LOI survived the merger.[174] In fact, Plaintiff's whole theory for this claim is that the merger terminated the rights under the October LOI, in frustration of the Investors' purpose when entering the October LOI.

Subsequent to the merger, Plaintiff alleges it received the assignment of the Investors' rights under the October LOI. Plaintiff alleges that, while it was not an original party to the October LOI, BGH and Inference assigned their rights under the October LOI to Plaintiff pursuant to the Assignment and Assumption Agreement on July 31, 2022.[175] Even assuming that such a post-merger assignment is relevant here, there are discrepancies between the Assignment and the rights Plaintiff seeks now to vindicate. The Assignment and Assumption Agreement refers to BGH and Inference together as "the Assignor;" BV Advisory as "Assignee"; and QPhoton as "Borrower," "Guarantors," and "Debtors."[176] It further defines "Notes" as two

---

[174] Nowhere does Plaintiff assert that the October LOI is still an executory contract.

[175] SAC ¶¶ 10 n.2, 127.

[176] Assignment and Assumption Agreement 1–2. Because Plaintiff relies on the Assignment and Assumption Agreement to establish its standing to enforce the October LOI, the incorporation by reference doctrine allows me to review the Assignment and Assumption Agreement to confirm that this agreement states what Plaintiff purports that it does.

36

"Convertible Promissory Debenture[s] due March 21, 2023."[177] The Assignment and Assumption Agreement provides in its recital that:

> the Assignor is the holder and beneficial owner of a binding Letter of Intent to invest $2,500,000 in the form of convertible promissory notes/debentures and common shares of QPhoton, Inc. dated and signed on October 30, 2021 identified in Section 7 below (each a "Note" and/or "Shares" . . . ) of Borrower [ ], each of which Notes was purchased by Assignor pursuant to a Securities Purchase Agreement dated as of March 21, 2021 between Borrower, the Assignor, and the other Persons . . . .[178]

While the Assignment and Assumption Agreement references "a binding Letter of Intent to invest $2,500,000 . . . dated and signed on October 30, 2021," the description of the security to be acquired thereunder is in "the form of convertible promissory notes/debentures and common shares of QPhoton." This differs from the October LOI itself, which Plaintiff seeks to enforce, in that the October LOI states that the security to be acquired would take the form of Series A Senior Convertible Stock.[179] This discrepancy is compounded because the securities identified in Section 7 of the Assignment and Assumption Agreement are listed as two debentures, each valued at $1,250,000, due on March 21, 2023; one is allegedly

---

[177] *Id.* at 2.
[178] *Id.* at 1.
[179] SAC, Ex. 8.

37

held by BGH and the other is held by Inference.[180]  These debentures are not reflected in the October LOI.[181]

Exacerbating these discrepancies, Exhibit A attached to the Assignment and Assumption Agreement lists the financing documents that were to be reassigned from BGH and Inference to BV Advisory.[182]  The list is limited to:

> [(1)] Securities Purchase Agreement, between QPhoton, Inc., (the "Company"), and purchase agreements other investors each purchaser identified on the signature pages thereto [ ][; (2)] Schedules to the Securities Purchase Agreement or Notes[; (3)] Original Issue Convertible Promissory Debenture of the Company due March 21 2023[; (4)] Debenture Schedules[; (5)] Registration Rights Agreement among the Company and the Purchasers. [(6)] Secretary's Certificate, executed by the Company[; and (7)] Officers' Certificate, executed by the Company[.][183]

By its own terms, the Assignment and Assumption Agreement did not transfer BGH and Inference's rights under the October LOI to Plaintiff.  Plaintiff's position is frustrated by the fact that there are fundamental discrepancies between the Assignment and Assumption Agreement and the October LOI itself.  I need not rely on these discrepancies in dismissing this claim, however.  Plaintiff's allegation of being "ready, willing, and able" to go forward is insufficient to state a claim for breach of the October LOI in the face of the failure to allege that the *Investors* took

---

[180] Assignment and Assumption Agreement § 7.
[181] *See* SAC, Ex. 8.
[182] Assignment and Assumption Agreement, Ex. A.
[183] *Id.*

any initiative to exercise those rights. Until that occurred, there was no duty on QPhoton's part, and thus a claim for the breach of the October LOI has not been stated. Therefore, Count III for breach of the October LOI is dismissed.

Again, I note that a breach of fiduciary duty claim survives the motion to dismiss. Nothing in this dismissal of the October LOI contract claim precludes any consideration of the facts surrounding the treatment of Plaintiff's attempt to exercise rights under the October LOI in that equitable claim, as appropriate. Likewise, the claim for breach of the NPA and the BV Notes in Count II is not subject to motions to dismiss: Plaintiffs are not precluded from arguing or demonstrating that the existence of the October LOI or its treatment by the parties is relevant to whether an Investor Financing event occurred under the NPA, or is otherwise pertinent to its NPA claim.

## 2. Counts IV–VI: Tortious Interference with Contract

Plaintiff next asserts three claims for tortious interference with three separate contracts. To state a claim for tortious interference with a contract, a plaintiff must plead that "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury."[184] "Knowledge of the contract itself is insufficient to establish a tortious interference claim; the actor must

---

[184] *WaveDivision Hldgs., LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).

also intend to interfere."[185] To establish intent to tortiously interfere with a contract, plaintiff must plead at least "'an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.'"[186]

"[W]here the claim for the underlying breach of contract has been dismissed, a claim for tortious interference with the same contract must also be dismissed."[187] Because I have dismissed Counts I and III for failure to state a claim for breach of the Voting Agreement and the October LOI, respectively,[188] Counts IV and VI must also be dismissed because there is no underlying breach to support Plaintiff's claims for tortious interference with the Voting Agreement and the October LOI, respectively. Plaintiff's remaining claim for tortious interference with a contract is Count V, which pertains to the NPA and BV Notes.[189]

Plaintiff alleges that Quantum and Pan knew of the existence of the NPA and BV Notes but tortiously interfered with QPhoton's performance under these

---

[185] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *28 (Del. Ch. Nov. 17, 2014) (internal quotations omitted).

[186] *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 766 cmt. j; *accord Grunstein v. Silva*, 2009 WL 4698541, at *16 (Del. Ch. Dec. 8, 2009)).

[187] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *6 (Del. Ch. Mar. 29, 2011).

[188] *See supra* Section II.B.1.

[189] I note that Quantum and the Founders did not move to dismiss Count II, which is the underlying breach of contract related to the NPA and BV Notes. Quantum OB 9 (explaining that the parties did not move to dismiss Count II because those parties believe that "discovery will show that QPhoton tendered payment in full.").

contracts by, *inter alia*, failing to pay the "Corporate Transaction Conversion Amount," with no justification, causing Plaintiff no less than $13 million in injury.[190] Quantum and Pan contend that Plaintiff has failed to plead that these Defendants engaged in any intentional act that was a significant factor in causing a breach of the NPA and BV Notes.[191]

Plaintiff points to five allegations in the Complaint as sufficient to allege that Quantum and Pan intentionally interfered with Plaintiff's rights under the NPA and BV Notes.[192] These allegations fall into two theories: first, that Quantum and Pan collaborated to freeze Plaintiff out of the merger negotiations to strike a deal that would circumvent Plaintiff's rights under the NPA, as evidenced by Quantum and Pan ignoring Plaintiff's attempts to exercise its rights under the NPA and the October LOI to purchase $2.5 million in Series A Senior Convertible Stock that would grant Plaintiff a 45% stake in QPhoton.[193] The second theory is that Quantum refused to cause QPhoton to honor Plaintiff's "right" to a 45% interest in QPhoton and refused

---

[190] SAC ¶¶ 182–85.

[191] Quantum's OB 32, 34. Pan is a director, and is not liable for causing QPhoton's breach of contract. *See Goldman v. Pogo.com, Inc.*, 2002 WL 1358760, at *8 (Del. Ch. June 14, 2002) (internal alterations, citations, and quotations omitted) (emphasis added) (explaining that "it is also generally accepted that . . . directors may be held personally liable for tortious interference with a contract of the corporation *if and only if* they exceed the scope of their agency in so doing"); *see also Dieckman v. Regency GP LP*, 2018 WL 1006558, at *5 (Del. Ch. 20, 2018) ("Simply alleging that . . . [a] director caused his company to breach its contract, . . . without more, is insufficient for a tortious interference claim.").

[192] Pl.'s AB Opp'n Quantum's MTD 34–35.

[193] SAC ¶¶ 14, 16, 119.

to pay Plaintiff $13 million, the value Plaintiff asserts it is owed as the "Corporate Transaction Conversion Amount" promised in the NPA.[194]

The problem with the first theory against Quantum and Pan is that it is entirely conclusory. Plaintiff's allegation of a conspiracy among all defendants is made frequently and vehemently throughout the Complaint, but only in a conclusory way. Plaintiff fails to aver how the merger's structure was manipulated so as to frustrate Plaintiff's contract rights. It does not suggest a merger structure that would have vindicated those rights, and how either party intentionally avoided it. In fact, in its breach of contract claim, as I understand it, Plaintiff avers it will show that those rights arising under the NPA are still enforceable. It does not allege specific acts by specific Defendants.

This is, of course, a notice pleading jurisdiction. A plain statement that puts the defendant on notice of the claim is sufficient. But this pleading fails that most basic of thresholds. "Even in an era of notice pleading, conclusory allegations of conspiracy have regularly been rejected."[195] While Plaintiff states that Quantum and Pan "collaborated to freeze [Plaintiff] out of merger negotiations," this allegation is conclusory and, more fundamentally, is not a breach of either the NPA or the BV

---

[194] *Id.* ¶ 145.
[195] *Greenfield v. Tele-Commc'ns*, 1989 WL 48738, at *3 (Del. Ch. May 10, 1989) (dismissing claim for failure to plead civil conspiracy where plaintiff alleged that a merger agreement was a "plan and scheme").

Notes.  Furthermore, Plaintiff has not explained how any action taken by Quantum and Pan were an intentional act that played a significant role in the alleged breach of the NPA by QPhoton.[196]  At best, Plaintiff alleges that unnamed Defendants encouraged QPhoton to breach its obligations; this is quintessential conclusory pleading.  Plaintiff asserts that Pan was involved in the formation of the Special Committee with the specific intent of excluding Plaintiff's board designee from negotiating the merger, thereby depriving Plaintiff of its contractual rights under the NPA.[197]  Again, this is contradicted by the fact that the Special Committee was formed *a week after* the Merger Agreement was finalized by Quantum and QPhoton.[198]

Plaintiffs second theory is that QPhoton failed to pay the correct amount owed to Plaintiff under the NPA after consummating the merger.  If true, this supports a claim for breach of contract, which is not the subject of the motion to dismiss and for which this litigation will proceed.  While Plaintiff avers in the Complaint that Quantum *failed to cause* QPhoton to pay the amount Plaintiff contends it is owed, Plaintiff clarified in its answering brief that Plaintiff is referring to Quantum's actions, *pre*-merger, that, at most, continued after the merger.[199]  Plaintiff has simply

---

[196] *See* Pl.'s AB Opp'n Quantum's MTD 34–35 (summarizing the allegations without arguing how these allegations support a reasonable inference that the allegations were intentional acts that were a significant factor in QPhoton's alleged breach).
[197] *Id.* at 17.
[198] SAC ¶ 39; Quantum's RB, Ex. A; Stipulated Timeline 11–12.
[199] Pl.'s AB Opp'n Quantum's MTD 36.

failed to allege an action by which Quantum was a significant factor causing QPhoton to breach the NPA. Accordingly, Plaintiff has failed to adequately allege that Quantum or Pan tortiously interfered with the NPA and BV Notes. Count V is dismissed.

### 3. Counts VII–VIII: Fiduciary Duty Claims

#### a. Count VII: Breach of Fiduciary Duty

In Count VII, Plaintiff contends that the Founders breached their fiduciary duties of care and loyalty owed to Plaintiff by failing to retain professionals to assist QPhoton in the merger negotiations; failing to obtain an independent valuation of QPhoton; failing to obtain a fairness opinion for the Merger; excluding Kotlarz from the merger negotiations; accepting a loan from Quantum; negotiating post-merger employment in the post-merger combined entity on behalf of Huang; and approving the merger.[200] Plaintiff argues that the merger was a conflicted transaction that should be reviewed under the entire fairness standard, thereby precluding dismissal.[201]

"Delaware's default standard of review is the business judgment rule[.]"[202] A plaintiff bringing suit, however, may rebut the presumption of business judgment if, for example, the plaintiff adequately alleges that the corporation's controlling

---

[200] *Id.* ¶ 191.
[201] Pl. BV Advisory's Answering Br. Oppp'n Huang and Pan's Mot. to Dismiss the SAC 4–10, Dkt. No. 69 ("Pl.'s AB Opp'n Founders' MTD").
[202] *In re MultiPlan Corp. S'holders Litig.*, 289 A.3d 784, 809 (Del. Ch. 2022).

stockholder has engaged in a conflicted transaction.[203]   Where a controlling stockholder stands on only one side of the transaction, the transaction is considered conflicted if the controlling stockholder "receives a unique benefit by extracting something uniquely valuable to the controller, even if the controller nominally receives the same consideration as all other stockholders to the detriment of the minority."[204]

Plaintiff avers that the Founders received a "panoply" of consideration at Plaintiff's detriment.[205]  That panoply, according to Plaintiff, consists primarily of (1) the Founders' allegedly wrongful retention of a 35% equity stake in QPhoton that Plaintiff asserts belonged to it under the terms of the NPA as it would have been triggered under October LOI, and (2) Huang's post-merger employment and related compensation package.[206]  In response, the Founders argue (1) the October LOI was unrelated to the merger and an alleged breach thereof cannot be conflated with a breach of fiduciary duty; (2) Plaintiff is estopped from asserting Huang is interested in the merger based on his post-merger employment because Plaintiff knew of and agreed to Huang receiving post-merger employment; (3) even if Plaintiff is not estopped, Huang's employment agreement does not amount to a disabling interest;

---

[203] *Id.*
[204] *Id.* at 810.
[205] Pl.'s AB Opp'n Founders' MTD 6.
[206] *Id.* at 6–10.

45

and (4) given Huang's large equity holdings in QPhoton, his interests were aligned with that of the minority.[207]

Plaintiff cannot state a claim for breach of fiduciary duty with respect to Plaintiff's contention that the Founders wrongfully retained the 35% equity stake in QPhoton that Plaintiff asserts rightfully belongs to it. Plaintiff's claim to this 35% equity stake arises solely from the contractual relationship between Plaintiff and Huang and QPhoton, as laid out in the NPA and the October LOI. Whether the Founders wrongfully retained equity in QPhoton that belonged to Plaintiff under such agreements would be subject to a breach of contract analysis, not a breach of fiduciary duty analysis.[208] As such, to the extent Plaintiff's breach of fiduciary duty claim relies on the Founders' alleged breaches of the NPA and the October LOI, such claim is properly dismissed as impermissible bootstrapping.

Plaintiff next contends that the merger was a conflicted transaction because Huang received post-merger employment that was accompanied by a compensation package consisting of (a) a $400,000 annual salary; (b) a stock issuance upon the merger's close worth $300,000; (c) a potential cash bonus worth up to $120,000; (d) an option to purchase an additional 400,000 shares in Quantum with accelerated

---

[207] Founders' OB 4–10; Founders' RB 9–10.

[208] *See Nemec v. Shrader*, 2009 WL 1204346, at \*4 (Del. Ch. Apr. 30, 2009), *aff'd*, 991 A.2d 1120 (Del. 2010) (internal quotations omitted) (explaining that where "the fiduciary claims relate to obligations that are expressly treated by contract then this Court will review those claims as breach of contract claims and any fiduciary claims will be dismissed.").

vesting; (e) severance payments equal to one year's salary; (f) unlimited fully-paid annual leave; (g) full expense reimbursement; and (h) fringe benefits including various insurance plans and retirement accounts.[209]  In response, the Founders note that Huang held over *80%* of the QPhoton's common stock, thereby that aligning his interests with Plaintiff, a minority stockholder.[210]  Moreover, the Merger Term Sheet *that Plaintiff itself* negotiated on behalf of QPhoton in November 2021 contemplated that Huang would receive a post-merger employment agreement.[211]

"Stockholders generally are presumed to have an incentive to seek the highest price for their shares."[212]  This "presumption is even stronger in the case of large stockholders."[213]  While Plaintiff seeks to have the Court infer that Huang was "bribed" with post-merger employment and its related compensation package, Plaintiff has not alleged any theories or facts under which I should ignore Huang's ownership of a majority QPhoton stock and his self-interested incentive to maximize his stock's value in the merger, in evaluating whether he received a non-ratable benefit.  To accept Plaintiff's assertion would require the Court to infer that Huang

---

[209] Pl.'s AB Opp'n Founders' MTD (citing SAC ¶ 133).

[210] Founders' OB 7–8; Founders' RB 5–6.

[211] SAC ¶ 94; SAC, Ex. 9 at 3.

[212] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *17 (Del. Ch. Oct. 24, 2014).

[213] *Id.* (declining to apply entire fairness where a plaintiff failed to allege persuasive facts or theories as to why a 33.7% stockholder would approve a merger "against their self-interests incentives as stockholders to maximize value."); *see also In re CompuCom Sys., Inc. S'holders Litig.*, 2005 WL 2481325, at *6 ("as the owner of a majority share, the controlling shareholder's interest in maximizing value is directly aligned with that of the minority.")

acted against his own economic interests by leaving tens millions of dollars in merger consideration at the bargaining table in favor of an employment agreement, the value of which is not material in comparison.[214] Such an inference is unreasonable. Accordingly, Plaintiff has not sufficiently alleged that the Founders received a non-ratable benefit from the merger to the detriment of Plaintiff.

Thus, Plaintiff has not alleged that the merger was a conflicted transaction that requires this Court to apply the entire fairness standard of review to the merger, with respect to the claims of breach of the duty of loyalty by Huang and Pan as interested fiduciaries.[215]

That does not end the analysis, however. Huang and Pan were directors of QPhoton. They have not pled the existence of an exculpation clause. Huang was also the CEO and corporate controller. He and Pan took over the merger negotiations once Plaintiff raised concerns about Quantum's actions. Per the Complaint, Huang and Pan did not cause QPhoton to obtain competent, non-conflicted professionals to assist QPhoton in the merger negotiations, nor did they cause QPhoton to obtain a

---

[214] According to Plaintiff's theory, Quantum "bribed" Huang into accepting an artificially-low valuation of QPhoton of $62 million when Plaintiff valued QPhoton between $100 and $210 million. *See* SAC ¶¶ 11, 17, 92, 96, 137, 139, 145. If I were to accept Plaintiff's valuations as true, Huang would be positioned to receive an additional $18 million to as much as $106 million in merger consideration, in return for a $400,000 annual salary. Plaintiff has not explained why Huang would thus act against his own economic interest to maximize his portion of the merger consideration. *See* Pl.'s AB Opp'n Founders' MTD 7–10.
[215] *See Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

fairness opinion for the merger. Allegedly, they did not keep their fellow director, Kotlarz, informed of negotiations.

Has Plaintiff stated a claim for breach of the fiduciary duty, at least with respect to the duty of care? If so, per Defendants, the claim is underwhelming, given the fact that Plaintiff itself shared financial data with Huang and QPhoton,[216] the merger agreed to was stock-for-stock at the same ratio proposed in Plaintiff's own term sheet, and the October LOI suggested a valuation far more modest than the merger consideration. Given the allegations, however, I cannot say at the pleadings stage that Huang and Pan were not grossly negligent. That will require a record. The allegations are sufficient, and the motion to dismiss the Count VII is denied.

### b. Count VIII: Aiding and Abetting Breach of Fiduciary Duty

Plaintiff contends that Quantum aided and abetted the Founders' breach of fiduciary duty. To state a claim for aiding and abetting of fiduciary duty, a plaintiff must allege "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach, and (iv) damages proximately caused by the breach."[217] The aiding and abetting claim must, under these facts and to be viable, allege that Quantum knew that Huang was acting with gross negligence or disloyalty, and that Quantum, with scienter, caused Huang to

---

[216] SAC ¶ 125.
[217] *In re Dole Food Co. S'holder Litig.*, 2015 WL 5052214, at *4 (Del. Ch. Aug. 27, 2015).

breach his duties. The actual pleading is entirely conclusory—Plaintiff repeats its allegation that the Quantum and its fiduciaries conspired with QPhoton to cause Huang and Pan to breach as fiduciaries, and is once again silent as to the details of the conspiracy. A successful pleading must aver with specificity how each defendant participated in the breach, with scienter. By contrast, the Complaint fails to plead specific facts that, if true, demonstrate less than an arms-length negotiation.

Plaintiff does allege that Quantum quit negotiation with BV Advisory personnel in favor of negotiating with Huang, the CEO, Chairman, founder and controller of QPhoton.[218] This occurred as negotiations with BV Advisory stalled because Barksdale questioned the $8 million in debt taken out by Quantum. I assume Quantum took this action because they believed negotiating with Huang would lead to a more favorable outcome for Quantum than negotiating with Barksdale. Standing alone, however, this falls short of a sufficient allegation of aiding and abetting. Accordingly, Count VIII for aiding and abetting a breach of fiduciary duty must be dismissed.

---

[218] The facts alleged in the Complaint are deficient in comparison to the facts resulting in a finding of liability for aiding and abetting in *In re Columbia Pipeline Group*. In that case, the acquirer was aware that CEO and CFO of the target entity held personal motivations to complete a sale of the entity by a date certain. *In re Columbia Pipeline Group*, 299 A.3d 393, 476–77 (Del. Ch. 2023). The acquirer also knew that these officers were naive negotiators. *Id.* The acquirer exploited this information, ultimately, to renege on an agreement in principle; it threatened to lower its bid and made a coercive threat to publicly announce that the negotiations were dead, in violation of a non-disclosure agreement. *Id.* at 477–78. While "a bidder is entitled to negotiate aggressively," the cumulation of acquirer's actions caused the acquirer to "topple[] over the line into liability" for aiding and abetting. *Id.* at 478, 481.

### 4. Count IX: Fraudulent Transfer

Plaintiff alleges that Defendants in this action worked together to strip QPhoton of its only significant asset, the Licensed Stevens IP, to avoid the capacity to pay QPhoton's liabilities owed to Plaintiff.[219] Plaintiff's fraudulent transfer claim is governed by the Delaware Uniform Fraudulent Transfer Act ("DUFTA").[220]

> DUFTA protects a "creditor" from two types of fraudulent transfers. *First*, 6 *Del. C.* § 1304(a)(1) prohibits "transfer[s]" by debtors that are made "with actual intent to hinder, delay or defraud" ("actual fraudulent transfers"). *Second*, 6 *Del. C.* § 1304(a)(2) prohibits "transfer[s]" by debtors where the debtor (i) did not receive "reasonably equivalent value" *and* (ii) was rendered insolvent ("constructively fraudulent transfers").[221]

According to Plaintiff, this transfer rendered QPhoton insolvent.[222] Because this is an attempt to state a 1304(a)(2) claim, I analyze the matter under that rubric.

### a. Constructive Fraudulent Transfer

To plead a claim for constructive fraudulent transfer under DUFTA, a plaintiff must plead that the debtor "(i) did not receive 'reasonably equivalent value' *and* (ii) was rendered insolvent."[223]

The Fraud Defendants submit that Plaintiff has failed to plead insolvency under DUFTA, which requires allegations that "the sum of the debtor's debts is

---

[219] SAC ¶¶ 198–202.
[220] 6 *Del. C.* §§ 1301–11.
[221] *Burkhart v. Genworth Fin., Inc.*, 250 A.3d 842, 854 (Del. Ch. 2020) (alterations in original) (citations omitted).
[222] SAC ¶ 201.
[223] *Burkhart*, 250 A.3d at 854 (alterations in original) (citations omitted).

greater than all of the debtor's assets, at a fair valuation."[224] I agree. Plaintiff has not adequately alleged that QPhoton's liabilities are in excess of a reasonable market value of its assets.[225] Plaintiff's assertions of insolvency are merely conclusory. While Plaintiff alleges I may infer that QPhoton was insolvent because a cashier's check sent by QPhoton as an intended repayment of the BV Notes lists Huang as the remitter,[226] this does not, without more, support a reasonable inference that QPhoton was insolvent.[227] Huang was the CEO and chairman of QPhoton's board of directors; his remittance of a check to satisfy a corporate obligation for QPhoton is insufficient to imply insolvency or actual intent to defraud Plaintiff.

Fundamentally, I note, the transfer of Licensed Stevens IP itself was part of a merger transaction in which QPhoton was sold to Quantum in return for tens of millions of dollars in Quantum stock, running to QPhoton stockholders. The Complaint does not attempt to demonstrate that this was not an arm's-length transaction. The facts pled do not support a claim under DUFTA.

---

[224] Quantum's OB 44–46 (quoting 6 *Del. C.* § 1302(a)).
[225] *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 197 (Del. Ch. 2014) (explaining that the insolvency test under DUFTA "is the same as Delaware's common law balance sheet test."); *see also Trenwick Am. Litig. Tr. v. Ernest & Young, L.L.P.*, 906 A.2d 168, 195 n.74 (Del. Ch. 2006) (internal quotations omitted) ("Insolvency in fact occurs at the moment when the entity has liabilities in the excess of a reasonable market value of assets held.").
[226] SAC ¶¶ 157–58 (citing SAC, Ex. 11).
[227] 6 *Del. C.* § 1304(b)(9). DUFTA explains how insolvency may be established: "(A) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation. (B) A debtor who is generally not paying debts as they become due is presumed to be insolvent." 6 *Del. C.* § 1302.

Plaintiff has not stated a claim for constructive fraudulent transfer under Section 1304(a)(2). Therefore, Count IX is for fraudulent transfer is dismissed.

### 5. Count X: Unjust Enrichment

Plaintiff asserts that Quantum, QPhoton, and the Founders have been unjustly enriched at Plaintiff's expense as a result of actions that resulted in (1) Quantum acquiring QPhoton for less than fair value and (2) the Founders receiving compensation and an alleged windfall resulting from Huang holding, wrongfully, 81% of the equity in QPhoton at the time of the merger.[228]

To state a claim for unjust enrichment, the plaintiff must plead "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[229] Unjust enrichment is not generally supported if a contract "governs the relationship between parties that gives rise to the unjust enrichment claim."[230]

The claims remaining, after this decision, against the Founders and QPhoton, are largely contractual, and to that extent, the unjust enrichment claim must be dismissed. I have allowed a breach of fiduciary duty claim against the Founders,

---

[228] Pl.'s AB Opp'n Quantum's MTD 44 (citing SAC ¶¶ 203–08).
[229] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010). *Garfield ex rel. ODP Corporation v. Allen* explains that the last element has puissance only in regard to subject matter jurisdiction. 277 A.3d 296, 346–51 (Del. Ch. 2022).
[230] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).

who will be liable to Plaintiff for damages or injunctive relief, should the allegations be proved—that relief would be as broad or broader than the relief conferred under an unjust enrichment theory. In addition, the portion of the breach-of-duty claim that was well pled was for gross negligence in the negotiation of the merger—that is unlikely to have enriched those defendants, Huang and Pan. I have dismissed the aiding-and-abetting claim against Quantum, and to nevertheless preserve the unjust enrichment claim against it would be to allow an improper bootstrap—if Quantum bargained at arm's length, it has received no unjustified enrichment.

Because I find that Plaintiff has either failed to plead an unjust enrichment claim, or is simply recasting a tort or contract claim, against each Defendant, Count X is properly dismissed.

## III. CONCLUSION

The Individual Defendants' motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction is GRANTED. Quantum and the Founders' motions to dismiss under Rule 12(b)(6) are GRANTED in part and DENIED in part. The parties should submit a form of order consistent with this Memorandum Opinion.